UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COZEN O'CONNOR, P.C.,

                Plaintiff,

    - against -

RICHARD S. FISCHBEIN,

                Defendant.

10-cv-3250 (AKH)

## PLAINTIFF COZEN O'CONNOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COZEN O'CONNOR**
**45 Broadway**
**New York, New York 10006**
**(212) 509-4900**

## TABLE OF CONTENTS

Preliminary Statement..................................................................................................... 1

UNDISPUTED FACTS ..................................................................................................... 3

    A.    Fischbein's Prior Experience ......................................................... 3

    B.    Cozen O'Connor's Compensation System ................................... 3

    C.    The Fischbein Badillo Transaction ............................................... 5

    D.    Fischbein's Employment ............................................................... 6

    E.    The Parties' Communications from 2006 - 2009............................ 7

    F.    Cozen O'Connor's Treatment of the Other Former Fischbein Badillo
        Attorneys with the Same Performance Bonus Language ....................... 9

    G.    The Amount Due............................................................................ 10

    H.    The Complaint ................................................................................ 10

ARGUMENT ...................................................................................................................... 10

I.      SUMMARY JUDGMENT STANDARD ........................................................ 10

II.     COZEN O'CONNOR IS ENTITLED TO SUMMARY JUDGMENT
       BECAUSE THE AGREEMENT IS UNAMBIGUOUS ................................. 11

III.    IN THE ALTERNATIVE, THE OBJECTIVE EXTRINSIC EVIDENCE
       IS ONE-SIDED IN COZEN O'CONNOR'S FAVOR.................................... 16

IV.    EVEN IF, *ARGUENDO*, THE PERFORMANCE BONUS HAD BEEN
       BASED ON ORIGINATIONS, FISCHBEIN HAS FAILED TO IDENTIFY
       HIS ALLEGED ORIGINATIONS ................................................................ 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3Com Corp. v. Banco do Brasil, S.A.,*
    171 F.3d 739 (2d Cir. 1999)..................................................................................1, 16

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..............................................................................................10

*Bell v. Reno,*
    218 F.3d 86 (2d Cir. 2000).....................................................................................15

*Brass v. American Film Techs., Inc.,*
    987 F.2d 142 (2d Cir. 1993)...................................................................................11

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,*
    769 F.2d 919 (2d Cir. 1985).............................................................................. 10-11

*Capital Ventures Int'l v. Verenium Corp.,*
    09 Civ. 4261 (GBD), 2011 U.S. Dist. LEXIS 1532 (S.D.N.Y. Jan. 3, 2011)..........................16

*Compagnie De Cic de L'Union Europeenne v. Merrill Lynch, Pierce,*
    *Fenner & Smith, Inc.,* 232 F.3d 153 (2d Cir. 2000)......................................................1, 16, 17

*D'Amico v. City of New York,*
    132 F.3d 145 (2d Cir. 1998)...................................................................................11

*Eighth Ave. Coach Corp. v. City of New York,*
    286 N.Y. 84 (1941) ...............................................................................................13

*Fujitsu Ltd. v. Fed. Express Corp.,*
    247 F.3d 423 (2d Cir. 2001)...................................................................................11

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,*
    309 F.3d 76 (2d Cir. 2002)................................................................................11, 15

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
    424 F.3d 195 (2d Cir. 2005)................................................................................12, 13

*Marcic v. Reinauer Transp. Cos.,*
    397 F.3d 120 (2d Cir. 2005)................................................................................14-15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)..............................................................................................11

*Mencher v. Weiss,*
    306 N.Y. 1 (1953) .................................................................................................16

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
     906 F.2d 884 (2d Cir. 1990)......................................................................................11

*NML Capital v. Republic of Argentina*,
     621 F.3d 230 (2d Cir. 2010).....................................................................................15

*Nycal Corp. v. Inoco P.L.C.*,
     988 F. Supp. 296 (S.D.N.Y. 1997) ..........................................................................16

*RJE Corp. v. Northville Indus. Corp.*,
     329 F.3d 310 (2d Cir. 2003)......................................................................................11

*Roco Carriers v. M/V Nurnberg Express*,
     899 F.2d 1292 (2d Cir. 1990)....................................................................................10

*Sayers v. Rochester Tel. Corp.*,
     7 F.3d 1091 (2d Cir. 1993)........................................................................................13

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
     959 F.2d 425 (2d Cir. 1992)......................................................................................12

*Spodek v. Park Property Dev. Assoc.*,
     96 N.Y.2d 577 (2001) .....................................................................................10 n.6

*Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*,
     63 N.Y.2d 396 (1984) ...............................................................................................13

*Wolf v. Rawlings Sporting Goods Co.*,
     10 Civ. 3713 (JSR), 2010 U.S. Dist. LEXIS 116294 (S.D.N.Y. Oct. 26, 2010) ....................15

*World-Link, Inc. v. Citizens Telecomms. Co.*,
     99 Civ. No. 3054 (GEL), 2000 U.S. Dist. LEXIS 18510 (S.D.N.Y. Dec. 27, 2000) ..............13

**STATUTES AND RULES**

CPLR 5001(a) .................................................................................................................10

Fed. R. Civ. P. 56(a) .......................................................................................................10

**OTHER**

Cotterman, James D., *Recognizing Origination*, Report to Legal Management, 2
     (Nov./Dec. 2009), http://www.altmanweil.com/dir_docs/resource/b5b73fc3-7568-
     4109-b5e6-f39bde343095_document.pdf.........................................................3 n.2

Hiscock & Barclay > Attorneys and Professionals > Search by Name > Fischbein,
     http://www.hblaw.com/profiles/details.asp?ID=311 (last visited Oct. 26, 2011) ..............3 n.1

## **Preliminary Statement**

This Memorandum of Law is respectfully submitted by Plaintiff Cozen O'Connor in support of its Motion for Summary Judgment.

Defendant Richard S. Fischbein ("Fischbein") received $1 million in salary in his first twelve months at Cozen O'Connor. At issue in this action is an additional $250,000 that he borrowed from the firm. As demonstrated below, the parties' agreement relating to that loan unambiguously provided that he must repay the $250,000 loan if the "'Billing Attorney' and/or 'Working Attorney' revenues (as those terms are defined by Cozen O'Connor)" that he generated in his first year of employment at Cozen O'Connor did not exceed $5 million. It is undisputed that the revenues he generated as a Billing Attorney and Working Attorney in that year were less than $1.3 million. Therefore, Cozen O'Connor is entitled to summary judgment for $250,000 plus interest. *See* Point II, *infra*.

As further demonstrated below, in the unlikely event that the Court determines that the employment agreement is ambiguous, summary judgment is still appropriate where, as here, the objective extrinsic evidence is one-sided in support of Plaintiff's claim. *See, e.g., Compagnie De Cic de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir. 2000); *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999); and cases cited in Point III, *infra*.

Here, the only contention of ambiguity results solely from Fischbein's belatedly manufactured litigation position – which is completely contradicted by his pre-litigation communications and conduct – that the word "generate" means "originate" in the following sentence in the parties' employment agreement:

> If you generate "Billing Attorney" and/or "Working Attorney" revenues (as those terms are defined by Cozen O'Connor) in excess of $5,000,000, in the fiscal year, you will be eligible for a performance bonus of $250,000.00.

After taking eight depositions and receiving thousands of pages of documents in discovery, the only purported evidence that Fischbein can offer in support of his litigation position is his own unsupported self-serving testimony.  In contrast, 100% of the objective extrinsic evidence – detailed below – demonstrates that the parties intended the performance bonus to be based solely on revenues that he generated as a Billing Attorney and Working Attorney, not based on his alleged origination of clients that allegedly resulted in other attorneys' Billing Attorney and Working Attorney revenues.  *See* Point III, *infra*.

As finally discussed below, even if, *arguendo*, the performance bonus had been based on Fischbein's originations, he has never identified – either before or during this litigation – matters that he allegedly originated that allegedly generated over $5 million in fees.  Therefore, in any event, Cozen O'Connor is entitled to summary judgment.

In sum, it is undisputed that, during Fischbein's first twelve months at Cozen O'Connor: (1) he received $1 million in salary; (2) he borrowed an additional $250,000 from the firm; and (3) he did not generate $5 million in revenues as a Billing Attorney and Working Attorney.  In such event, the parties' agreement unambiguously requires him to repay the $250,000 with interest.  Further, 100% of the objective extrinsic evidence demonstrates that the parties intended his performance bonus to be based solely on the revenues he generated as a Billing Attorney and Working Attorney, not his originations.  Therefore, the parties' agreement requires him to repay the $250,000 he borrowed from the firm, with interest, for which Cozen O'Connor is entitled to summary judgment as a matter of law.

## UNDISPUTED FACTS

### A.   Fischbein's Prior Experience

Fischbein has been a practicing lawyer since 1971.  Fischbein 12/18/09 Aff. ¶ 2 (Civ.

Dckt. No. 7).  He was a name partner of Fischbein Badillo Wagner Harding ("Fischbein

Badillo") for 30 years.  *Id.* ¶¶ 9-11.  He has "more than 20 years of experience handling complex

commercial crises and litigation issues."[1]  While he was at Fischbein Badillo, his firm, unlike

Cozen O'Connor, tracked "originating attorney" revenues.[2]  Fischbein 7/27/11 Dep. 11:19-23

(Ex. 8 to Jacoby Declaration dated October 25, 2011 ("Jacoby Decl.")).

### B.   Cozen O'Connor's Compensation System

Cozen O'Connor was founded in 1970 in Philadelphia.  Prior to the Fischbein Badillo

transaction described below, Cozen O'Connor had approximately 500 attorneys in 21 offices,

including a Manhattan office.  In the year prior, the firm had revenues of over $200 million, for

which it was listed in the "Am Law 100" in July 2005.  Jacoby Decl. ¶ 4.

Because most of Cozen O'Connor's revenues were, from its inception, derived from

institutional clients originated by a limited number of senior attorneys in the firm, Cozen

O'Connor maintained a system of compensation for attorneys based on revenues generated by

the attorney's billable hours and responsibilities for managing legal services for the clients rather

than an attorney's origination of clients.  Cozen O'Connor classified these revenues as "Working

Attorney" revenues for fees generated from an attorney's billable hours and "Billing Attorney"

---

[1]      Hiscock & Barclay > Attorneys and Professionals > Search by Name > Fischbein,
http://www.hblaw.com/profiles/details.asp?ID=311 (last visited Oct. 26, 2011).

[2]      Nearly 50% of law firms surveyed in 2009 did not track origination.  James D.
Cotterman, *Recognizing Origination*, Report to Legal Management, 2 (Nov./Dec. 2009),
http://www.altmanweil.com/dir_docs/resource/b5b73fc3-7568-4109-b5e6-
f39bde343095_document.pdf.

revenues for fees generated from matters for which the attorney was designated as the "Billing Attorney" in the records of the firm. "Billing Attorney" was defined by Cozen O'Connor as the attorney with the primary responsibility for managing a particular matter, while "Working Attorney" was defined as an attorney who worked on the matter. Jacoby Decl. ¶¶ 4-5.

In 2005 and 2006, Cozen O'Connor did not utilize an "Originating Attorney" classification and did not track or record revenues based on origination of a client. Cozen O'Connor began utilizing an "Originating Attorney" classification in 2009. Jacoby Decl. ¶ 6.

In 2005 and 2006, because Cozen O'Connor's attorney compensation system was premised on the revenues an attorney generated as a Working Attorney and Billing Attorney rather than client origination, when the firm negotiated a performance bonus for senior lawyers joining the firm, the employment agreement contained a "performance bonus" based on the objective criteria of the revenues that the attorney generated as a Working Attorney and Billing Attorney – and the firm reported those revenues monthly to the attorney and other members of the firm. Jacoby Decl. ¶ 7.

The standard "performance bonus" provision used by Cozen O'Connor in written employment agreements in 2005 and 2006 contained the following objective formula for determining the attorney's entitlement to a performance bonus:

> Your performance bonus eligibility will be in the total amount of $[  ] per fiscal year, provided you meet the thresholds set forth herein. If you generate "Billing Attorney" and/or "Working Attorney" revenues (as those terms are defined by Cozen O'Connor) in excess of $[  ] in the fiscal year, you will be eligible for a performance bonus of $[  ].

Jacoby Decl. ¶ 8; Ex. 1 at 1-2; Exs. 2-5 at 1.

In 2005 and 2006, Cozen O'Connor delivered monthly to each member a computer printout listing his and other attorneys' Working Attorney and Billing Attorney revenues for that month and cumulatively for the year to date. Because Cozen O'Connor did not track

originations at that time, the firm could not and did not generate a report of originations.  Jacoby Decl. ¶ 9.

###   C.     The Fischbein Badillo Transaction

In late 2004 and early 2005, Stephen A. Cozen, Patrick O'Connor and F. Warren Jacoby had several conversations with Fischbein and certain senior members of Fischbein Badillo concerning their prospective employment with Cozen O'Connor.  They explained to each of them, including Fischbein, the firm's history of compensation based on an attorney's Working Attorney and Billing Attorney revenues.  They explained to each of them, including Fischbein, that, unlike Fischbein Badillo, Cozen O'Connor did not track client originations but, rather, would track his Working Attorney and Billing Attorney revenues for the purpose of determining his entitlement to the "performance bonus" under his employment agreement.  Jacoby Decl. ¶ 10.

Cozen O'Connor offered five attorneys from Fischbein Badillo, including Fischbein, its standard "performance bonus" provision.  The other four attorneys were Richard Berney, Donald David, Howard Hornstein and Menachem Kastner.  The five employment agreements were each dated March 14, 2005 and each contained Cozen O'Connor's standard "performance bonus" provision.  Jacoby Decl. ¶¶ 11-12; Exs. 1-5; Berney Declaration dated October 24, 2011 ("Berney Decl.") ¶ 3; Hornstein Declaration dated October 24, 2011 ("Hornstein Decl.") ¶ 3; Kastner Declaration dated October 25, 2011 ("Kastner Decl.") ¶ 3.

Each of the five Fischbein Badillo attorneys with the performance bonus provision, including Fischbein, was evaluated after his first year at Cozen O'Connor for the performance bonus based on the fees he generated as a Billing Attorney and Working Attorney, not based on his originations.  Each of those attorneys, except Fischbein, met his Billing Attorney and Working Attorney target and was in fact paid his contractual performance bonus based on the

fees he generated as a Billing Attorney and Working Attorney, not based on his originations. Jacoby Decl. ¶ 35; Berney Decl. ¶ 8; Hornstein Decl. ¶ 8; Kastner Decl. ¶ 8.

### D.   Fischbein's Employment

Fischbein's employment with Cozen O'Connor commenced March 21, 2005.  His employment terminated 15 months later in June 2006.  Jacoby Decl. ¶ 13.

Fischbein was paid $1 million for his first twelve months pursuant to his employment agreement.[3]  In addition, his agreement contained the following "performance bonus" formula:

> If you generate "Billing Attorney" and/or "Working Attorney" revenues (as those terms are defined by Cozen O'Connor) in excess of $5,000,000.00 in the fiscal year, you will be eligible for a performance bonus of $250,000.00.

Jacoby Decl. ¶ 14; Ex. 1, at 1-2.

In addition, Fischbein's agreement allowed him to borrow $250,000 from the firm as follows:

> [T]he firm will provide a loan to you in the amount of $250,000.00.  Each loan shall be repaid by you following the end of each year, out of any performance bonus earned by you with respect to that year.  If no performance bonus is earned by you for such year…then such loan will become a three (3) year term loan, payable in 36 equal monthly installments, together with interest on the unpaid balance thereof…

Jacoby Decl. Ex. 1, at 2.

From May to September 2005, pursuant to the loan provision in his employment agreement, Fischbein wrote five letters each requesting to borrow $50,000 from Cozen

---

[3]   The employment agreement identified $250,000 of Fischbein's $1 million annual salary as a "contingent bonus," which was separate from the "performance bonus" at issue in this action.  The $250,000 "contingent bonus" was based upon the performance of the firm and further contingent on Fischbein being employed by Cozen O'Connor at the end of his fiscal year, which Fischbein was, and the "contingent bonus" was paid to him in full.  Jacoby Decl. ¶ 14 n.3.

O'Connor, for a total of $250,000.  Each letter from Fischbein described the $50,000 payment as "a personal loan per our agreement":

> Please accept this letter as a formal request to draw Fifty Thousand Dollars ($50,000.00) as a personal loan per our agreement in my employment letter dated March 14, 2005.

Jacoby Decl. ¶ 16; Ex. 6.

In 2005 and 2006, on a monthly basis, Fischbein received a computer printout listing his and other attorneys' Working Attorney and Billing Attorney revenues for that month and cumulatively for the year to date.  Jacoby Decl. Ex. 7.  Fischbein never brought to Cozen O'Connor's attention or raised any concern as to any alleged error in any of the monthly reports. Jacoby Decl. ¶ 19.

Because Cozen O'Connor did not track originations at that time, Cozen O'Connor could not and did not distribute a report of originations.  Fischbein 7/27/11 Dep. 10:21-22 ("I never got anything that said 'originating attorney'") (Jacoby Decl. Ex. 8); Jacoby Decl. ¶ 9; Berney Decl. ¶ 7; Hornstein Decl. ¶ 7; Kastner Decl. ¶ 7.

Fischbein's Billing Attorney and Working Attorney revenues totaled $1,245,394.70 in the first 12 months of his employment with Cozen O'Connor.  Jacoby Decl. ¶ 23; Exs. 9, 10.

### E.   The Parties' Communications from 2006 - 2009

By letter dated August 31, 2006, Cozen O'Connor formally notified Fischbein that, since he had not earned a performance bonus during his employment, the $250,000 he had borrowed from the firm was repayable in 36 monthly installments with interest in accordance with his employment agreement.  Jacoby Decl. Ex. 11.  Fischbein did not dispute the August 31, 2006 letter and invoice.  Jacoby Decl. ¶ 25.

Monthly thereafter, through March 2009, Cozen O'Connor mailed invoices to Fischbein for the principal and interest owing pursuant to his employment agreement. Jacoby Decl. Ex. 12. Fischbein did not dispute the monthly invoices. Jacoby Decl. ¶ 28.

After the loan matured, Fischbein admitted, by email dated August 20, 2009, that he owed Cozen O'Connor the $250,000 plus interest:

> Two years ago when we had lunch, I agreed to pay the firm $100,000 a quarter every quarter starting with the first payment that I get from the Casino until I paid approximately $300,000. . . .[4]
>
> * * *
>
> I am still prepared to live up to the deal. . . . . . . . . . . Starting a lawsuit is dumb, it will cost us both money, gain nothing and require me to defend **something which I have already agreed to pay!**

Jacoby Decl. Ex. 13 (emphasis added).

By letter dated October 22, 2009, Cozen O'Connor formally demanded payment of the full amount of principal and interest due. Jacoby Decl. Ex. 14. Fischbein did not dispute the demand letter. Jacoby Decl. ¶ 31.

At no time in the five years prior to this lawsuit did Fischbein express his current litigation position that the standard performance bonus provision in his and the other four former Fischbein Badillo attorneys' employment agreements was based on untracked "origination" of clients, as opposed to the objective Billing Attorney and Working Attorney revenues reported by the firm to Fischbein and the other members monthly. Jacoby Decl. ¶¶ 31, 42.

Neither prior to nor during this litigation has Fischbein ever identified matters he allegedly originated that allegedly generated over $5 million of fees. Jacoby Decl. ¶ 32.

---

[4] The actual amount owing at maturity of the loan was $297,322. Jacoby Decl. Ex. 16.

**F.      Cozen O'Connor's Treatment of the Other Former Fischbein Badillo
          Attorneys with the Same Performance Bonus Language**

There was a dispute resolution procedure in place to address and correct any alleged

errors in the monthly reports of Billing Attorney and Working Attorney revenues that Cozen

O'Connor distributed to its members, including Fischbein.  There was no dispute resolution

procedure for "originations" because an attorney's subjective belief as to origination was

irrelevant to the contractual performance bonus formula.  Jacoby Decl. ¶ 39.

        For example, Fischbein and another former Fischbein Badillo attorney with Cozen

O'Connor's standard performance bonus formula, Richard Berney, have both asserted in their

depositions in this case that they originated Time Warner as a client.  Fischbein 7/27/11 Dep.

27:5-7; Berney Dep. 6:9- 7:14 (Jacoby Decl. Exs. 8, 15).  Irrespective of who "originated" Time

Warner, Mr. Berney was the Billing Attorney for the Time Warner matters and was therefore

credited with the Time Warner fees as "Billing Attorney" revenues under his performance bonus

formula.  Fischbein, Berney and the other former Fischbein Badillo attorneys with the same

performance bonus language were each evaluated for their performance bonus based only on

their objective reported Billing Attorney and Working Attorney revenues, not based on the

subjective concept of whether they "originated" a client or matter.  Jacoby Decl. ¶ 40; Berney

Decl. ¶ 8; Hornstein Decl. ¶ 8; Kastner Decl. ¶ 8.

        Years after the fact, Fischbein is seeking credit toward his performance bonus target for

matters he allegedly originated for which the other four attorneys with the same performance

bonus formula already received their performance bonus payments based on their objective

reported Billing Attorney and Working Attorney revenues in those same matters.  If he were so

credited, it would result in Cozen O'Connor paying twice for the same revenues.  Jacoby Decl.

¶ 41.

### G.    The Amount Due

The amount owing by Fischbein at maturity of the loan was $297,322.[5]  Jacoby Decl.

¶ 43; Ex. 16.  In addition, statutory prejudgment interest at the rate of 9% per annum accrues on

each monthly amount due until judgment is entered.[6]  A spreadsheet showing the total amount

due, including statutory interest, can be provided to the Court for any date that judgment will be

entered.  An example, using December 31, 2011 as the date of judgment, is set forth in Jacoby

Decl. Ex. 17.

### H.    The Complaint

The amended complaint (Civ. Dckt. No. 39) sets forth two claims for relief:  (1) a breach

of contract claim for Fischbein's failure to repay the $250,000 loan pursuant to his employment

agreement; and (2) an account stated claim based on Fischbein's failure to dispute any of Cozen

O'Connor's invoices for repayment of the loan.

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  In response to a motion for summary judgment, the nonmoving party must set

forth specific evidentiary facts establishing the existence of a genuine issue of fact for trial.

*Roco Carriers v. M/V Nurnberg Express*, 899 F.2d 1292, 1298 (2d Cir. 1990).

---

[5]    A slightly higher amount, $298,369.74, was mistakenly set forth in Cozen O'Connor's October 21, 2009 invoice, due to miscalculation of interest (Jacoby Decl. Ex. 14).

[6]    *Spodek v. Park Property Dev. Assoc.*, 96 N.Y.2d 577, 581 (2001) ("We hold that CPLR 5001(a) permits a creditor to recover prejudgment interest on unpaid interest and principal payments awarded from the date each payment became due under the terms of the promissory note to the date liability is established.").

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  *See also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir. 1985) ("disputes over irrelevant facts must not be allowed to obscure the lack of a material dispute").

To defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).  At the summary judgment stage, a nonmoving party "must offer some **hard evidence** showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (emphasis added).

As demonstrated below, Fischbein has not produced and cannot offer any hard evidence that his version of the events is anything more than fanciful.  Indeed, his <u>only</u> purported evidence in support of his belated litigation position is his wholly unsupported self-serving testimony which is completely contradicted by his pre-litigation communications and conduct (and by the testimony of three other former Fischbein Badillo attorneys whose employment agreements with Cozen O'Connor contained the same performance bonus language).

## II.   COZEN O'CONNOR IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE AGREEMENT IS UNAMBIGUOUS

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal quotations omitted).  Summary judgment on a contract claim is appropriate

where, as here, the contract language is unambiguous. *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 148 (2d Cir. 1993).

"The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself...." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). The Court considers "the entire contract to safeguard against adopting an interpretation that would render any individual provision superfluous." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (internal quotations omitted). "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotations omitted).

Moreover, ambiguity does not arise "simply because the parties urge different interpretations," or if one side's reading "strains the contract language beyond its reasonable and ordinary meaning." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (internal quotations omitted).

Here, the sentence at issue based upon Fischbein's belated litigation position is Cozen O'Connor's standard performance bonus provision in his employment agreement:

> If you generate "Billing Attorney" and/or "Working Attorney" revenues (as those terms are defined by Cozen O'Connor) in excess of $5,000,000, in the fiscal year, you will be eligible for a performance bonus of $250,000.00.

Jacoby Decl. Ex. 1, at 1-2; *see also* Exs. 2-5.

The foregoing sentence is clear that the performance bonus was based solely on the attorney's generation of revenues as a Billing Attorney and Working Attorney, not, as Fischbein contends, on the attorney's origination of clients. The agreement does not mention, refer to or even imply the concept of "origination." "Origination" is a well-known term of art in law firm compensation meaning the development of business for the firm. If the parties had meant the

12

performance bonus to be based on origination of business, they would have used that well-known term.  Instead, they used Cozen O'Connor's standard performance bonus phrase, "generate 'Billing Attorney' and/or 'Working Attorney' revenues (as those terms are defined by Cozen O'Connor)."

      The New York Court of Appeals has explained that a word with different meanings in isolation should not be read out of its context in a sentence, nor the sentence out of its context in the agreement, nor the agreement out of its context with the circumstances of its creation:

> Words considered in isolation may have many and diverse meanings.  In a written document **the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation**.

*Eighth Ave. Coach Corp. v. City of New York*, 286 N.Y. 84, 89 (1941) (emphasis added).

      Here, reading the word "generate" in the context of the entire sentence, the sentence in the context of the entire agreement, and the agreement in the context of the parties negotiating a law firm compensation agreement, leads to only a single meaning:  that the performance bonus was based solely on the fees generated by Fischbein as a Billing Attorney and Working Attorney, not based on his originations of clients that may have resulted in other attorneys' Billing Attorney and Working Attorney revenues.  Otherwise, there would have been no reason to add the defined terms "Billing Attorney" and "Working Attorney" – the clause could have read simply "If you generate revenues in excess of...."  Thus, interpreting "generate" as "originate" in this context would render superfluous and meaningless the phrase "'Billing Attorney' and/or 'Working Attorney' ... (as those terms are defined by Cozen O'Connor)."

      As cautioned by the Second Circuit, rendering a clause superfluous or meaningless "is not preferred and will be avoided if possible."  *LaSalle Bank*, 424 F.3d at 206 (internal quotations omitted).  Likewise, the New York Court of Appeals has stated that, "[i]n construing a

contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless." *Two Guys From Harrison-N.Y., Inc.* v. *S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (1984); *see, e.g., World-Link, Inc. v. Citizens Telecomms. Co.*, 99 Civ. No. 3054 (GEL), 2000 U.S. Dist. LEXIS 18510, at *6 (S.D.N.Y. Dec. 27, 2000) ("when interpreting a contract, court must 'safeguard against adopting an interpretation of a provision that would render any individual provision superfluous,'" quoting *Sayers v. Rochester Tel. Corp.*, 7 F.3d 1091, 1095 (2d Cir. 1993)).

There is an additional reason that interpreting "generate" to mean "originate" would render "'Billing Attorney' and/or 'Working Attorney' . . . (as those terms are defined by Cozen O'Connor)" superfluous:  the Billing Attorney revenues and the Working Attorney revenues for any particular matter, or any particular period of time, are necessarily the same revenues – each dollar collected is listed in both categories.  Therefore, there would have been no need to include Billing Attorney revenues in the formula if Fischbein was to get credit for other lawyers' work – and no need to include Working Attorney revenues in the formula if Fischbein was to get credit for other lawyers' billings.

To illustrate, if an attorney's rate was $500/hour, and he worked one hour on a matter, and Cozen O'Connor collected the $500, then that attorney would get credit for $500 of Working Attorney revenues, and the Billing Attorney would also get credit for $500 of Billing Attorney revenues.   It would be the same $500 being classified in two different revenue categories. Therefore, if, as Fischbein contends, the performance bonus provision gave him credit for other lawyers' work or billings in matters he originated, then there would have been no need to reference both Billing Attorney <u>and</u> Working Attorney revenues in the formula.  The inclusion of "'Billing Attorney and/or 'Working Attorney' revenues" in the formula makes sense only if the formula applies to revenues Fischbein generated <u>as</u> a Billing Attorney and/or Working attorney.

Thus, for this additional reason, interpreting "generate" as "originate" would render the clause "'Billing Attorney' and/or 'Working Attorney' . . . (as those terms are defined by Cozen O'Connor)" inoperative.

No word or phrase should be rendered inoperative in an agreement. *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 132 (2d Cir. 2005) ("The most serious flaw with the district court's interpretation, however, is that it renders the word 'minimum' in the CBA provision entirely superfluous and nugatory, when an interpretation is available that gives effect to all of the provision's language.") (emphasis added); *Wolf v. Rawlings Sporting Goods Co.*, 10 Civ. 3713 (JSR), 2010 U.S. Dist. LEXIS 116294, at *6 (S.D.N.Y. Oct. 26, 2010) ("Any other interpretation would render the phrase 'including in each case' mere surplusage, and it is a well established cannon of construction that a court should not construe a provision so as to render a word or phrase inoperative," citing *Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000)).

Under the foregoing authorities, in order to avoid rendering the language "'Billing Attorney' and/or 'Working Attorney' . . . (as those terms are defined by Cozen O'Connor)" superfluous and meaningless, "generate" must refer to the revenues Fischbein generated as a Billing Attorney and Working Attorney, not revenues other lawyers generated in matters he allegedly originated. And, as previously noted, that is precisely the way Cozen O'Connor's compensation system operated.

Moreover, unlike Cozen O'Connor, Fischbein Badillo, which Fischbein managed for 30 years, tracked "originating attorney" revenues. Fischbein 7/27/11 Dep. 11:19-23 (Jacoby Decl. Ex. 8). He therefore obviously knew the term of art "origination" in the context of law firm compensation. Reading the Cozen O'Connor performance bonus language from the view of a "reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood

in the particular trade or business," *NML Capital v. Republic of Argentina*, 621 F.3d 230, 241 (2d

Cir. 2010) (quoting *Int'l Multifoods*, 309 F.3d at 83), leads ineluctably to the conclusion that the

parties would have used the terms "originate" or "origination" if in fact they had intended to base

the performance bonus on client origination. They did not.

* * *

The foregoing demonstrates that the performance bonus provision is not ambiguous and

was based on fees to be generated by Fischbein as a Billing Attorney and Working Attorney, not

on his originations. Because it is undisputed that he generated less than $5 million of fees as a

Billing Attorney and Working Attorney, Cozen O'Connor is entitled summary judgment as a

matter of law.

## III.   IN THE ALTERNATIVE, THE OBJECTIVE EXTRINSIC EVIDENCE IS ONE-SIDED IN COZEN O'CONNOR'S FAVOR

In the unlikely event that the Court finds the performance bonus provision ambiguous,

Cozen O'Connor is still entitled to summary judgment because 100% of the objective extrinsic

evidence – detailed below – demonstrates that the parties intended the performance bonus to be

based solely on revenues Fischbein generated as a Billing Attorney and Working Attorney, not

on his originations. As explained by the Second Circuit:

> [T]he court may resolve ambiguity in contractual language as a
> matter of law if the evidence presented about the parties' intended
> meaning [is] so one-sided that no reasonable person could decide
> the contrary.

*Compagnie De Cic de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232

F.3d 153, 158 (2d Cir. 2000) (quoting *3Com*, 171 F.3d at 746-747).

Under New York law, only objective manifestations of intent may be considered in

contract interpretation. *Capital Ventures Int'l v. Verenium Corp.*, 09 Civ. 4261 (GBD), 2011

U.S. Dist. LEXIS 1532, at *12 (S.D.N.Y. Jan. 3, 2011) ("In reviewing such extrinsic evidence,

this Court only considers the parties' objective manifestations of intent"); *Nycal Corp. v. Inoco P.L.C.*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997) ("The purpose of contract interpretation, of course, is to determine the intentions of the parties. Under New York law, this is accomplished by examining the objective manifestations of the parties' intentions"); *Mencher v. Weiss*, 306 N.Y. 1, 7 (1953) ("the manifestation of a party's intention rather than the actual or real intention is ordinarily controlling").

Summary judgment is warranted where, as here, "the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Compagnie*, 232 F.3d at 158. Here, after taking eight depositions and receiving thousands of pages of documents in discovery, Fischbein has not produced and cannot offer a scintilla of objective extrinsic evidence supporting his interpretation. Rather, his sole purported evidence is his own unsupported self-serving testimony.

In contrast, the following overwhelming objective extrinsic evidence demonstrates that the parties intended the performance bonus to be based solely on revenues Fischbein generated as a Billing Attorney and Working Attorney, not based on his originations:

A.      In 2005 and 2006, Cozen O'Connor maintained a system of compensation for attorneys based on revenues generated by the attorney's billable hours (Working Attorney) and client responsibilities (Billing Attorney), not the attorney's origination of clients. Jacoby Decl. ¶ 4; Berney Decl. ¶¶ 4-5; Hornstein Decl. ¶¶ 4-5; Kastner Decl. ¶¶ 4-5.

B.      In 2005 and 2006, Cozen O'Connor did not utilize an "Originating Attorney" classification and did not track or record revenues based on an attorney's origination of clients. Jacoby Decl. ¶ 6; Berney Decl. ¶ 7; Hornstein Decl. ¶ 7; Kastner Decl. ¶ 7.

C.      Cozen O'Connor entered into employment agreements with four other Fischbein Badillo attorneys that contained the same performance bonus language as Fischbein's. Each of

the five, including Fischbein, was evaluated after his first year of employment for his performance bonus based the fees he generated as a Billing Attorney and Working Attorney, not based on his originations.  Jacoby Decl. ¶¶ 11, 35; Berney Decl. ¶ 8; Hornstein Decl. ¶ 8; Kastner Decl. ¶ 8.

       D.     Each of the five attorneys with the same performance bonus language, other than Fischbein, met his Billing Attorney and Working Attorney target and was paid his contractual performance bonus based on the fees he generated as a Billing Attorney and Working Attorney, not based on his originations.  Jacoby Decl. ¶ 35; Berney Decl. ¶ 8; Hornstein Decl. ¶ 8; Kastner Decl. ¶ 8.

       E.     In 2005 and 2006, Cozen O'Connor delivered monthly to each member, including Fischbein, a computer printout listing his and other attorneys' Working Attorney and Billing Attorney revenues for that month and cumulatively for the year to date.  Cozen O'Connor did not distribute, or even have, computer printouts or data listing an attorney's client originations or revenues from any such clients.  Jacoby Decl. ¶ 9; Ex. 7; Berney Decl. ¶¶ 6-7; Hornstein Decl. ¶¶ 6-7; Kastner Decl. ¶¶ 6-7.

       F.     Fischbein never brought to Cozen O'Connor's attention any alleged error in any of the monthly reports.  Jacoby Decl. ¶ 19.

       G.     After maturity of the loan, Fischbein admitted, by email dated August 20, 2009, his obligation to repay the $250,000 loan with interest.  Jacoby Decl. Ex. 13.

       H.     Fischbein, who had been a practicing lawyer for over 35 years, did not dispute Cozen O'Connor's August 31, 2006 letter and invoice stating that he did not meet his performance bonus target and must repay the $250,000 loan.  Jacoby Decl. ¶¶ 24-26; Ex. 11.

       I.     Fischbein did not dispute Cozen O'Connor's monthly invoices for repayment of the $250,000 loan with interest.  Jacoby Decl. ¶¶ 27-28; Ex. 12.

J.      Fischbein did not dispute Cozen O'Connor's demand letter dated October 22, 2009.  Jacoby Decl. ¶¶ 30-31; Ex. 14.

K.      At no time in the five years prior to this lawsuit did Fischbein express his litigation position that the performance bonus provision in his and the other four attorneys' employment agreements (Jacoby Decl. Exs. 1-5) was based on origination of clients, as opposed to the objective Billing Attorney and Working Attorney revenues reported by the firm to Fischbein and the other members monthly.  Jacoby Decl. ¶¶ 31, 42.

L.      Neither prior to nor during this litigation has Fischbein ever identified clients he allegedly originated that allegedly generated over $5 million of fees.  Jacoby Decl. ¶ 32.

* * *

In short, in the unlikely event that the Court finds the performance bonus provision ambiguous, the objective extrinsic evidence unwaveringly demonstrates that the parties intended the performance bonus to be based solely on fees Fischbein generated as a Billing Attorney and Working Attorney, not on his originations.  Because it is undisputed that he generated less than $5 million of fees as a Billing Attorney and Working Attorney, Cozen O'Connor is entitled to summary judgment as a matter of law.

## IV.   EVEN IF, *ARGUENDO*, THE PERFORMANCE BONUS HAD BEEN BASED ON ORIGINATIONS, FISCHBEIN HAS FAILED TO IDENTIFY HIS ALLEGED ORIGINATIONS

At no time in the six years since his employment with Cozen O'Connor – including during discovery in this action – has Fischbein ever identified the matters he allegedly originated at Cozen O'Connor that allegedly generated over $5 million in fees.  Jacoby Decl. ¶ 32. Fischbein was asked to identify such matters a year ago in discovery – and again three months ago in discovery – but failed to do so.  Fischbein 11/17/10 Dep. 42:11-20; Fischbein 7/27/11 Dep. 11:24-12:21; 20:10-22:8 (Jacoby Decl. Ex. 8).

As shown in Points II and III above, Fischbein's client originations are irrelevant to his contractual performance bonus. However, even if, *arguendo*, his performance bonus had been based on originations, he has failed to identify his alleged originations in discovery and has failed to produce any evidence in support of his litigation position. Therefore, in any event, his failure and inability to support his purported defense entitles Cozen O'Connor to summary judgment as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Cozen O'Connor's Motion for Summary Judgment should be granted in the amount of $297,322 plus statutory prejudgment interest at the rate of 9% per annum from the date each loan payment was due until the date judgment is entered.

Dated: New York, New York
October 26, 2011

COZEN O'CONNOR

By:_____/s/_____
   Kenneth G. Roberts (kroberts@cozen.com)
   Jill L. Mandell (jmandell@cozen.com)
45 Broadway
New York, New York 10006
(212) 509-9400